# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 51580

RAÚL R. LABRADOR, in his official capacity
as Attorney General of the State of Idaho,

    Plaintiff-Appellant,

v.

IDAHO STATE BOARD OF EDUCATION,
an agency of the State of Idaho, in its capacity
as the Board of Regents of the University of
Idaho,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, June 2024 Term

Opinion filed: December 5, 2024

Melanie Gagnepain, Clerk

_____

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Jason D. Scott, District Judge.

The judgment of the district court is <u>vacated</u>, <u>reversed</u>, and <u>remanded</u>.

Idaho Attorney General's Office, Boise, for Appellant. Joshua N. Turner argued.

Gjording Fouser, PLLC, Boise, for Respondent. Stephen L. Adams argued.

_____

MOELLER, Justice.

Fifty years ago this year, the Idaho Legislature enacted the Idaho Open Meetings Law, which commences with an unequivocal affirmation that:

> The people of the state of Idaho in creating the instruments of government that serve them, do not yield their sovereignty to the agencies so created.

I.C. § 74-201.[1] Consistent with its recognition of the people's unyielded sovereignty, the legislature found and declared that "it is the policy of this state that the formation of public policy is public business and shall not be conducted in secret." *Id.* To that end, the legislature provided that "all meetings of a governing body of a public agency shall be open to the public and all persons

_____

[1] Act of Apr. 2, 1974, ch. 187, 1974 Idaho Sess. Laws 1492–95. The Idaho Open Meetings Law is set forth in Idaho Code sections 74-201 to 74-208. For ease of reference, it will sometimes be referred to herein as "the Act."

1

shall be permitted to attend any meeting except as otherwise provided by this act." I.C. § 74-203(1).

In the case before us, we are called upon to interpret and give effect to these words. In so doing, we are mindful of the same practical considerations that the legislature itself acknowledged exist for any entity—even a governmental one—that does business in a competitive environment. Indeed, over time the legislature has crafted ten exceptions to the open meetings requirement in Idaho Code section 74-206(1); however, it mandated that "[t]he exceptions to the general policy in favor of open meetings *shall be narrowly construed*." I.C. § 74-206(2) (emphasis added). Relevant to this case is the exception in Idaho Code section 74-206(1)(e), which permits the governing body of a public agency to meet in a closed-door "executive session" when necessary "[t]o consider preliminary negotiations involving matters of trade or commerce in which the governing body is in competition with governing bodies in other states or nations[.]" I.C. § 74-206(1)(e).

With this legal framework long in place, on May 18, 2023, the Idaho State Board of Education ("the Board") publicly approved a proposal for the University of Idaho to purchase the University of Phoenix, a for-profit online institution, for the price of $550 million. Funding for the purchase would be accomplished through a $685 million bond, which was also publicly approved by the Board. However, questions soon arose about what transpired in three closed-door "executive sessions" held prior to the public meeting. Thereafter, Idaho Attorney General Raúl R. Labrador, pursuant to his statutory duty to enforce the Idaho Open Meetings Law under Idaho Code section 74-208(5), brought suit to void and nullify the sale, alleging violations of the open meeting requirements. The district court ultimately dismissed the suit after finding the Board had committed no violations of the Open Meetings Law.

At issue in this case is whether the Board, during the three executive sessions, was: (1) engaged in preliminary negotiations regarding the purchase and (2) in competition with the governing body of another state. Thus, the interpretation of the phrases "preliminary negotiations" and "is in competition with," both found within Idaho Code section 74-206(1)(e), is key to determining whether the actions of the Board fell within the exception to the Idaho Open Meetings Law when it held private, executive meetings regarding its purchase of the University of Phoenix. For the reasons stated below, we conclude that the district court erred in its expansive interpretation of these two phrases that provide only narrow exceptions to the general policy of transparency in

2

the Open Meetings Law. Because the district court's erroneous interpretations shaped its rulings on the scope of discovery, summary judgment, and the bench trial that followed, we vacate and remand the district court's grant of partial summary judgment and its judgment dismissing the action following trial. We also reverse the court's decision denying the Attorney General's motion to amend the Complaint by adding a claim related to the April 23, 2023, executive session, and vacate the award of attorney fees to the Board.

## I. FACTUAL AND PROCEDURAL BACKGROUND

What is *known* of the general background facts of this case appears to be undisputed—it is what is *unknown* that has ultimately brought this case to us. At a public meeting held on May 18, 2023, "the state board of education and board of regents of the University of Idaho"[2] unanimously approved terms for the University of Idaho to acquire the University of Phoenix. The University of Phoenix is described throughout the record as a privately owned, "for-profit" university that is "among the largest and most well-known providers of online education." The approved acquisition was to be made through a newly created, non-profit corporation called "NewU," which would be created by the University of Idaho for the specific purpose of purchasing the University of Phoenix for the price of $550 million. The Board also approved funding the purchase through bonding estimated at $685 million.

The district court found that "[b]efore May 18, [2023,] the proposed acquisition seem[ed] to have been a well-kept secret." As explained in the court's decision on summary judgment, the only notice to the public came the day before a public vote was held:

> The preceding day, a meeting agenda was publicly posted, describing the business to be conducted as follows: "Formation of Affiliated Entity to Acquire Private Higher Education Institution and Authorization for Execution of Asset Purchase Agreement - Action Item." The agenda was no more specific than that about the proposed acquisition and, indeed, did not identify the acquisition target as the University of Phoenix.

The district court found that the Board "had discussed the proposed acquisition during executive sessions—meaning, sessions closed to the public—in three meetings over the preceding two months, on March 22, April 25, and May 15." These three executive sessions of the Board were closed to the public pursuant to Idaho Code section 74-206(1)(e), purportedly "[t]o consider preliminary negotiations involving matters of trade or commerce in which the governing body is

---

[2] I.C. §§ 33-101, 33-2802.

in competition with governing bodies in other states or nations[.]" I.C. § 74-206(1)(e). Prior to the public announcement, and apparently to keep the target of the acquisition secret, the project was referred to by the players involved in the various stages of negotiations under the code name: "Project Neptune."

While the fact that the three executive sessions occurred is not in dispute, the full scope of what was discussed and decided at these private meetings remains largely unknown. Moreover, based on the record on appeal, it cannot be said with certainty who was present at these executive sessions. Most importantly, it is also unknown whether the Board took any actions or made any decisions during these executive sessions. Little is known about what took place prior to the May 18 public meeting because the district court severely limited the Attorney General's right to discovery early in the litigation based on its broad construction of the phrase "preliminary negotiations" in section 74-206(1)(e). This was an unusual step in such a factually dense case. *See, e.g., Gilbert v. Moore*, 108 Idaho 165, 168, 697 P.2d 1179, 1182 (1985) ("In district court, the parties have the right to discovery and to file supplemental pleadings."). What we do have in the appellate record provides us with a brief but somewhat veiled glimpse into Project Neptune and what transpired at the executive sessions leading up to the Board's public vote to approve the purchase of the University of Phoenix.

### A. Factual Background

The district court found that "[i]n late January 2023, the University of Idaho learned from Wells Fargo Bank that the University of Phoenix was seeking to be acquired." After some initial communications, the broker representing the University of Phoenix, Tyton Partners, and the chief financial officer for the University of Idaho, Brian Foisy, executed a non-disclosure agreement. The agreement is not in the record. However, Acting General Counsel for the University of Idaho, Kent Nelson, explained in an email to the Board's assigned deputy attorney general that "[t]he University [of Idaho] is responsible for maintaining confidentiality among the University team members given access to confidential information. The Regents and necessary board staff are encompassed within the group that . . . can receive confidential information." Notably, there is nothing in the record suggesting that the Board approved or was even consulted about the nondisclosure agreement at the time it was signed. Further, there is nothing in the record indicating the basis for Foisy's authority to make such an agreement that potentially binds the University of Idaho and its regents.

4

On March 14, 2023, President C. Scott Green forwarded an email to nine people, including specific University of Idaho personnel, a Wells Fargo representative, and at least three members of the Board, titled "Process Letter."[3] This email contained a portion of the email that was originally sent to President Green by the Managing Director of Tyton Partners earlier that same day, explaining that it contained an "attached process letter which outlines next steps" for a possible purchase of the University of Phoenix. The attached letter "invited" the University of Idaho to "submit a non-exclusive and non-binding Indication of Interest" (hereafter "IOI") in purchasing the University of Phoenix, with the intention of signing "an Asset Purchase Agreement with one party in May 2023." The Process Letter included a detailed set of requirements to be included within the IOI, including:

> In order for the University [of Phoenix] to evaluate University of Idaho's ability to sign a transaction on the timeline described above, we request that you submit a letter in conformity with, and clearly indicating each of the following details:
>
> a) **Identity & Structure:** Please indicate your proposed acquiring entity and its organizational structure, including affiliation with University of Idaho's parent system. The University of Phoenix is particularly focused on how the University will be integrated within the parent system, and whether the University will benefit from the full faith and credit of the parent system.
>
> b) **Purchase Price & Valuation:** the amount of cash in U.S. dollars, (the "Purchase Price") that you are willing to pay for the acquisition of 100% of the University. You should also include the basis and primary assumptions underlying such value, together with any conditions or qualifications you would attach to such value. In your Indication, you should assume the University will be delivered free of cash and debt, with normal levels of working capital.
>
> c) **Due Diligence:** Please provide a list of key areas on which your diligence would focus. Please identify by name any external accountants, attorneys, consultants, financial and other advisers who will assist you in the potential transaction, and indicate which of those have already been engaged.
>
> d) **Timing:** Your proposal should include a timeline showing your expected path to execution of definitive agreements, including an outline of the time needed to complete your due diligence prior to the execution of definitive agreements. If applicable, your proposal should clearly indicate any facts or circumstances that might affect the timing or certainty of closing. This includes required approvals necessary to consummate the potential

---

[3] The nine people on the email were: John Duke of the law firm Hogan Lovells, University of Idaho General Counsel Kent Nelson, University of Idaho CFO Brian Foisy, Lee Espey, Torrey Lawrence, Ryan Poulsen from Wells Fargo, University of Idaho Regent Bill Gilbert, University of Idaho Regent Kurt Liebich, and University of Idaho Regent Dave Hill.

transaction, both within your institution (Board, faculty, or other), as well as any external approvals (regulatory, governmental, financing, or other) and the identity of the agency or other organization providing such approvals. Your proposal should also provide an estimate of the length of time you would require to secure such approvals.

The attached letter also included a reminder about the terms of the previously executed "Confidentiality Agreement" and stated: "***You may not contact any present or past employee, corporate partner or student of the University unless specifically authorized in advance*** [by Tyton Partners]." (Emphasis in original). Further, the letter set a deadline for submitting an IOI: "Your Indication must be delivered via email by 12:00 pm ET on Friday March 17, 2023."

Trial testimony suggests that no Board members signed the nondisclosure agreement. Further, other than testimony that the Board members were advised of the nondisclosure requirement, it is not clear if the Board members reviewed or even saw the nondisclosure agreement. Based on the trial testimony, the only person to sign the nondisclosure agreement was Brian Foisy, the CFO and Vice President of the University of Idaho. While Foisy was the only person to sign the agreement, the Board president testified that he "felt" bound by it—and believed that any discussion about the acquisition of the University of Phoenix had to take place in an executive session.

Additionally, documents in the record suggest that the confidentiality agreement was administered by Tyton Partners and required by the University of Phoenix. The record also shows that the University of Phoenix gave the University of Idaho access to its "data room" in exchange for it agreeing not to disclose certain matters related to the sale. Nothing in the record suggests that the University of Phoenix was in any way bound by confidentiality for any matter related to the transaction. Quite the opposite, the record indicates that only the University of Idaho was bound by a nondisclosure agreement.

Sometime after the process letter was sent to the University of Idaho inviting it to submit an IOI, it received an undated email from Greg Finkelstein, a managing director of the broker Tyton Partners. The email contained a status update on "Project Neptune" and listed other potential parties interested in acquiring the University of Phoenix, including "UMass," "National," and

6

"Ark."[4] The email also sets forth the status of the negotiations with the University of Idaho, which included in relevant part:

- o Scott will be sending a reply to our letter Wednesday of next week
- o Reply should be complete or extremely near complete
- o Also would like to schedule a call to discuss *their reply* once we have digested and he noted that *they want to move quickly to LOI*
- o Notes – Scott was given three check-marks [sic] before he can move forward:
  - ▪ Governor's approval – received
  - ▪ A second one he didn't note but indicated that it was resolved
  - ▪ Vote by entire board to move forward – owing to spring break, they can't get this group together until next W (hence the delay)

(Emphasis added). It is unclear whether "their reply" as referenced in the email is the IOI, but that would be consistent with the timeline. Further, although Finkelstein's email says that Tyton Partners wished to "move quickly to LOI," it is not certain whether the Board ever prepared or sent an LOI ("Letter of Intent") or if this was mistakenly referring to the IOI. The record includes at least two references to an LOI, although counsel for the Board stated at oral argument before this Court that there was not an LOI. Finally, the email also refers to a "[v]ote by entire board to move forward." It is unclear whether this refers to a vote by the Board "to move forward" with negotiations, to submit an indication of interest, or if this was referencing the final approval that would ultimately take place at the May 18, 2023, public meeting.

At the March 22, 2023, executive session, the Board was shown a slide presentation. Testimony in the record suggests that Deputy Attorney General Marcus and Deputy Executive Director Freeman were present along with the Board at all meetings.[5] The slide presentation shown to the Board suggests that they were given an "executive summary" of Project Neptune. After the executive summary, the next three slides concerned the financial viability of the acquisition, the preferred structure of the acquisition, and due diligence considerations. Slide 6 of the presentation outlined "immediate next steps," which included "[o]btain[ing] indication of support to proceed

---

[4] Although the two other parties mentioned in this email had expressed interest in the deal, the record on appeal focuses largely on the one party that was publicly known: the University of Arkansas System.

[5] The slide presentation from all three executive sessions also listed "presenters." However, this was not addressed in the findings of facts, and, as mentioned above, there was no definitive evidence in the record who was present at each of these meetings.

with due diligence and submit Indication of Interest ("IOI")[,]" and "[s]ubmit[ting] IOI to the Seller's Advisor with valuation between $600MM-$650MM . . . ."

Notably, it is not clear what an "indication of support to proceed" entailed and whether this included a "[v]ote by entire board to move forward," as stated in the email from Finkelstein. Slide 6 also indicated that the next step was to "[p]erform Phase 1A of due diligence, governance structure and funding with target group of external advisors[.]" The slide further characterized this as a "[c]ritical due diligence period" for a period of one to two months, with the results then being reported to the Board. Notably, the slide states that performing due diligence would require "up to ~$1.5MM [in] cost[s.]" The day after this meeting, as admitted in the Board's answer to the Amended Complaint, "[t]he University of Idaho executed an Indication of Interest on March 23, 2023." Despite being mentioned frequently in the record, the IOI is not in the record.

Around this time, David Boone, a senior advisor at Reith Jones Advisors, emailed an article to Acting General Counsel Nelson and CFO Brian Foisy. In that email, Boone explained that they had been "monitoring the news closely and thought this recent article may be of interest." The article explained that the University of Arkansas System board of trustees had its first "public briefing" on the "proposal for a non-profit affiliate to buy the for-profit University of Phoenix." The article reported that Arkansas's board of trustees planned "to take Phoenix plan to a divided board for a vote on Monday." In turn, Acting General Counsel Nelson forwarded the article and the email to President Green, University of Idaho Provost Torrey Lawrence, and CFO Foisy. Thereafter, the managing director of PFM Financial Advisors, Ryan Conway, emailed the CFO: "FYI, the University of Arkansas System Board just voted 'no' on a resolution to support entering into license and affiliation agreements with a non-profit organization whose intent was to purchase the University of Phoenix." He wrote that he had "a call with the board of that nonprofit entity scheduled tomorrow morning (at the latest) to confirm next steps, which may be the conclusion of their efforts." Thus, prior to the April 25, 2023, executive session, the University of Arkansas System board of trustees had voted "no" on the proposal and University of Idaho officials were aware of this vote. The record also contains an email from Greg Finkelstein, a managing director of the broker Tyton Partners, speculating that there was the potential that the University of Arkansas "could push it forward without [its board of trustees'] approval given their rules/structure but unlikely."

The record is unclear as to how much information about Arkansas dropping out of the competition was shared with the Board prior to its meeting to discuss Project Neptune on April 25, 2023. Nevertheless, the Board again met in executive session on April 25, 2023, despite the University's knowledge that they may no longer be in competition with Arkansas.

At the April 25, 2023, meeting, participants were shown a new slide presentation that began with a meeting agenda. The agenda shows that President Green and Provost Lawrence discussed "Meetings with Neptune Leadership." After that discussion, the agenda indicates that there was a "Legal M&A, Transaction Structure" presentation from John Duke of the law firm of Hogan Lovells. The slide lays out a step-by-step process of the transaction, which includes the formation of the new non-profit entity to be known as "NewU" that would acquire and own the University of Phoenix. This would take place after the completion of "due diligence, financing plans, and agreement negotiations." After these initial steps were completed, the presentation suggests that the next step would be to "propose[] Purchase Agreement to [the Board] for approval," followed by "[e]nter[ing] into Purchase Agreement."

At the same meeting, following a presentation on the regulatory components of the deal, a discussion on the financial structure of the deal, and subsequent financial projections, the slide presentation again listed the "immediate next steps." The first was to "[o]btain continuation of support to proceed with enhanced due diligence and incur additional costs." The next steps included "completion of financing plan and commitments," "[d]iscuss and finalize communication plan," and "[s]chedule off-cycle [Board] meeting to review and approve Acquisition Agreement."

The third and final executive session of the Board regarding Project Neptune took place on May 15, 2023. This meeting was again held in secrecy, although it appears that there were no other competitors after Arkansas pulled out. The slide presentation from this executive session detailed the specifics of the legal structure, financial information, pro forma projections, and valuations for the completion of Project Neptune. As for the legal structure, Slide 4 of the presentation explained that "[t]he governance structure for NewU starts with the [Board] as the Sole Member of the non-profit corporate entity[,]" which will "appoint[] all members of the NewU Board" and "[m]ay remove a director from the NewU Board." Further, "[t]he NewU Board then sits in governance structure for NewU in much the same manner that the [Board] sit[s] in governance of the University of Idaho." The slide also stated that the governance of the University of Idaho by the Board would remain unchanged.

9

Slide 15 included a comprehensive, 12-part communication plan by which the transaction would be announced to the stakeholders and the public. The seventh action item was a public meeting of the Board for an "approval vote." As with the other executive session presentations, this slide-deck also included an "immediate next steps" slide. The agenda listed, among other action items, the "[d]eliver[y] [of] agenda documents to [the Board] for consideration and approval," "[c]ommunciation plan execution," "[s]pecial Board meeting for consideration of Term Sheet and 501c3 incorporation," and "[f]inalize and execute APA."

The notice for the May 15, 2023, meeting of the Board included three action items and would begin at 8:00 a.m. MST. Later, at 12:09 p.m. that same day, the articles of incorporation for NewU, Inc. were filed with the Idaho Secretary of State by Kent Nelson, the incorporator and acting General Counsel for the University of Idaho. However, there is nothing in the record showing whether the Board voted to approve or assented to the creation of this new entity at this meeting.[6]

Finkelstein, who does not appear to have attended the May 25, 2023, executive session, testified in a deposition about his perspective on what occurred after the executive session: "[T]he mechanical actions that followed were [President Green] indicating that the *deal was, ostensibly through our lens, was approved*, and then we had this kind of sprint to activate now between that moment and getting to a fully signed agreement to qualify for the deadlines that we were cooperatively chasing." (Emphasis added). Counsel for the Attorney General clarified "that would have been what was conveyed to you following the May 15th executive session, correct?" Finkelstein responded: "Correct." On May 18, 2023, the Board held its first public meeting to discuss the transaction. Prior to the Board meeting, a notice containing an agenda was published within the timeliness requirements found in the Idaho Open Meetings Law. The notice made no mention of Project Neptune, NewU, or even the University of Phoenix. It only contained the following action item: "Formation of Affiliated Entity to Acquire Private Higher Education Institution and Authorization for Execution of Asset Purchase Agreement."[7]

---

[6] However, as discussed more below, the resolution approved by the Board at the May 18, 2023, meeting included a provision where the Board ratified the actions of Nelson in creating this new entity.
[7] In addition to the formal notice, we note that the record also contains an email press release that was distributed as well, which did mention the University of Phoenix. This distinction is not relevant to this opinion and it appears that the district court considered only the official published agenda in its analysis.

At that public meeting, the Board considered a resolution related to the purchase of the University of Phoenix. In that resolution, the Board was asked to (1) ratify the actions of Acting General Counsel Kent Nelson in forming a non-profit organization, NewU, to acquire the University of Phoenix, (2) approve the Asset Purchase Agreement, and (3) approve the contemplated financing structure. The resolution ultimately approved by the Board contains confusing and contradictory language. For example, in the recitations it states:

> WHEREAS, there have been presented to the University a term sheet and other related summary documents, presentations, and materials (collectively, "Term Sheet"), which contemplate and collectively describe the material terms and conditions of *a negotiated Asset Purchase Agreement* ("APA"), by and among NewU, Inc., an Idaho nonprofit corporation ("Buyer"), The University of Phoenix, Inc., an Arizona corporation ("Seller"), and the University, pursuant to which Buyer will acquire from Seller substantially all of the assets and assume certain liabilities of Seller, subject and pursuant to the terms and conditions described in the Term Sheet (which *will be documented* in the signed APA) and related documents containing definitive terms (the "Transaction")[.]

(Bold lettering omitted; italics added). This language suggests that the APA was already fully "negotiated" *before* the meeting, and that the Board was merely being asked to publicly approve the Term Sheet. However, according to the resolution, in a later section titled "Approval of the APA," the Board was voting to approve "the terms and provisions of the Transaction, as described in the Term Sheet, *to be documented in the APA* and other Transaction Documents, all as described by the Term Sheet." Importantly, the order in which the Term Sheet, Asset Purchase Agreement, and other potential documents were executed or completed by the parties may be of key significance in this case; however, the timeline for when those agreements were executed is uncertain in the record. Importantly, except for the Term Sheet, there is no copy of the Asset Purchase Agreement, the nondisclosure agreement, the IOI, or any potential LOI in the record.

The Board approved the resolution at the May 18, 2023, public meeting. However, like many critical components of this case, a transcript or a recording of that meeting was also not included in the record. All we do know is that the meeting was scheduled to begin at 1:00 p.m. MST and the Board approved a $685 million bond-financed transaction later that same day.

Notwithstanding this recitation of what is known about the transaction, there are important loose ends that are still unresolved. In addition to the documents noted above, there is no record of whether any "actions" or votes were taken by the Board prior to May 18, 2023, or whether any other decisions were made "for the purpose of taking any final action or making any final

11

decision." I.C. § 74-206(3). Put simply, while the three slide presentations give us some idea of what the University intended to tell the Board, we do not know what it was actually told, how it responded, and what, if any, actions it took.

## B. Procedural History

The Attorney General commenced this action in the magistrate division of the district court on June 20, 2023. The action was based on the Attorney General's statutory duty to enforce the Idaho Open Meetings Law. I.C. § 74-208(5). Although the Act provides that "[a]ny person . . . may commence a civil action in the magistrate division of the district court," I.C. § 74-208(6), the administrative district judge for the Fourth Judicial District entered orders reassigning the matter to the district court and appointing the Honorable Jason D. Scott, District Judge, to preside over the case.[8]

In the original Complaint, the Attorney General alleged that the Board held three executive sessions to consider the proposed acquisition. This original complaint only contained one count relating to the May 15, 2023, executive session, and the prayer for relief only sought nullification on the basis of that executive session. Thereafter, the Board moved to dismiss.[9] "Faced with a motion to dismiss his original complaint, Attorney General Labrador exercised his right of amendment without need for court permission under I.R.C.P. 15(a)(1)(B)," which was filed on August 3, 2023—44 days after the filing of the original complaint. While the original complaint sought nullification only on the basis that the May 15, 2023, meeting failed to comply with the Idaho Open Meetings Law, the amended complaint asserted that both the April 25, 2023, and May 15, 2023, meetings did not comply with the Idaho Open Meetings Law and that each was an independent basis for nullification of the Board's action on May 18, 2023. Additionally, the amended complaint added a claim based on an alleged failure to comply with the notice and agenda requirements of the Idaho Open Meetings Law. *See* I.C. § 74-204.

The Board filed an answer to the Amended Complaint on August 14, 2023. That same day, the Board also filed separate motions seeking: (1) summary judgment, (2) an order disqualifying the Attorney General from prosecuting this action due to a conflict of interest, and (3) an expedited hearing on the first two motions. The basis for the motion to disqualify was a phone call Attorney

---

[8] Since the parties did not object to this reassignment from the magistrate court or raise it on appeal, we express no opinion on its propriety.
[9] The grounds for dismissal remain unclear since the motion to dismiss is not part of the record on appeal.

General Labrador and Solicitor General Theodore J. Wold made to the Deputy Attorney General assigned to the Board, Jenifer Marcus, and the Board's executive director, Matt Freeman. The Board alleged that it had freely shared information with the Attorney General as if he were acting as its attorney, only to later be informed that the Attorney General would be filing suit against the Board.

The district court opted to take up the motion to disqualify first, ordering "expedited briefing and an expedited hearing." The motion to disqualify was heard and taken under advisement on August 24, 2023. The following day, on August 25, 2023, the district court granted the Board's motion to disqualify the Attorney General in part. Specifically, the district court ordered that "Attorney General Labrador, Solicitor General Wold, and Deputy Attorney General Longfield are disqualified from serving as counsel in this action." However, recognizing that the Office of the Attorney General had a statutory duty to enforce the Idaho Open Meetings Law, as set forth in Idaho Code section 74-208(5), the district court also concluded that the Office of the Attorney General may continue to "pursue this action as plaintiff, represented by conflict-free counsel."

The Office of the Attorney General's new, conflict-free litigation team filed a notice of substitution of counsel on September 5, 2023. Thereafter, as the district court explained: "Two days later, the [district court] issued a procedural order on the [Board's] motion for summary judgment that expedited discovery, expedited briefing, and set a summary-judgment [sic] hearing for October 26, 2023." The order expediting discovery soon met roadblocks as the parties held differing interpretations of the exceptions to openness in Idaho's Open Meetings Law and what was discoverable. The Board later moved for a protective order based in part on its interpretation of the Act, arguing that because this action was "simple" and of a "limited nature," discovery should also be limited. The district court again ordered expedited briefing and scheduled an expedited hearing for October 5, 2023, to resolve the discovery dispute and to consider the motion for a protective order. At the October 5th hearing, the district court addressed its interpretation of Idaho Code section 74-206(1)(e). However, the transcript of this hearing is not in the record and was not reduced to writing prior to summary judgment. However, recognizing that "the proper interpretation . . . is central to the [Board's] motion for summary judgment," the district court later included its interpretation of Idaho Code section 74-206(1)(e) in its decision on summary

13

judgment, where it ruled that "preliminary negotiations" means all negotiations and that "in competition with" includes a reasonableness requirement.

Ultimately, the district court concluded that the additional claims added to the Amended Complaint were time barred by the 30-day "statute of limitations" within the Idaho Open Meetings Law because the additional claims did not relate back under Rule 15 of the Idaho Rules of Civil Procedure. Then, after concluding that " 'preliminary negotiations,' as used in section 74-206(1)(e), . . . encompass[es] *all negotiations preliminary to contracting*[,]" the district court granted summary judgment "on all but one issue." (Emphasis added).[10] Thus, the district court determined that the sole remaining issue for trial was whether "the executive session during the May 15 meeting was unlawful because the Board of Regents was not then in competition with another governing body to acquire the University of Phoenix." In determining what amounts to "in competition with," the district court also ruled at summary judgment that "a subjective standard applies, under which section 74-206(1)(e) is satisfied if a governing body, based on the information it has at the time of an executive session, *reasonably believes it is in competition* with another governing body." (Emphasis added).

Following the bench trial held in late January 2024, the district court found that the Board members reasonably believed that they were still in competition with another governing body. Therefore, because the court found that the Board "reasonably believed at the time of the May 15 executive session that it was in competition with the governing bodies of one or more public agencies in other states to acquire the University of Phoenix, most notably the University of Arkansas, [Idaho Code] section 74-206(1)(e) permitted that executive session." Having found that the Board reasonably believed it was in competition, the district court concluded that "Attorney General Labrador's[11] remaining theory fails." Thereafter, the district court entered a judgment of dismissal with prejudice.

The district court later awarded $233,362.87 in attorney fees and $9,363.15 in costs to the Board pursuant to Idaho Code section 12-117(4), or, in the alternative, under Idaho Code section 67-1406(5). Notably, the attorney fee award was reduced from $265,237.50 due to redacted billing entries and block billing.

---

[10] The Attorney General had also moved for a continuance based on its need for further discovery under Rule 56(d), which the district court denied.

[11] Notably, Attorney General Labrador was no longer in the case because to the district court had previously ordered that he be replaced by conflict-free counsel.

14

The Attorney General timely appealed to this Court.

## II. STANDARDS OF REVIEW

As this Court has often explained: "[i]ssues of statutory interpretation are questions of law which are reviewed by this Court de novo." *State, Dep't of Health & Welfare v. Doe (2022-32)*, 171 Idaho 677, 680, 525 P.3d 715, 718 (2023) (first quoting *Smith v. Kount, Inc.*, 169 Idaho 460, 463, 497 P.3d 534, 537 (2021); and then citing *State v. Schultz*, 151 Idaho 863, 865, 264 P.3d 970, 972 (2011)). Similarly, this Court freely reviews a district court's interpretation of court rules, such as the Rules of Civil Procedure. *E. Idaho Econ. Dev. Council v. Lockwood Packaging Corp. Idaho*, 139 Idaho 492, 495, 80 P.3d 1093, 1096 (2003).

When this Court reviews a grant of summary judgment de novo, it employs the same standard of review used by the district court in ruling on the motion for summary judgment. *United Heritage Prop. & Cas. Co. v. Zech*, 170 Idaho 764, 770, 516 P.3d 1035, 1041 (2022) (quoting *AED, Inc. v. KDC Invs., LLC*, 155 Idaho 159, 163, 307 P.3d 176, 180 (2013)). As we have consistently explained, "[s]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 228, 494 P.3d 769, 776 (2021) (quoting I.R.C.P. 56(a)).

When summary judgment is sought prior to a bench trial, "[d]rawing probable inferences under such circumstances is permissible since the court, as the trier of fact, would be responsible for resolving conflicting inferences at trial." *Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Tr.*, 147 Idaho 117, 124, 206 P.3d 481, 488 (2009) (citing *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 519, 650 P.2d 657, 661 (1982)). While this rule applies to probable inferences drawn from the undisputed evidentiary facts, "[c]onflicting evidentiary facts . . . must still be viewed in favor of the nonmoving party." *Id.* (citing *Argyle v. Slemaker*, 107 Idaho 668, 670, 691 P.2d 1283, 1285 (Ct. App. 1984)).

This Court has also explained that "[f]ollowing a bench trial, this Court will not set aside a trial court's findings of fact unless they are clearly erroneous." *Frost v. Gilbert*, 169 Idaho 250, 262, 494 P.3d 798, 810 (2021) (first citing *Turcott v. Est. of Bates*, 165 Idaho 183, 188, 443 P.3d 197, 202 (2019); and then citing I.R.C.P. 52(a)(7)). "However, this Court exercises free review over the district judge's conclusions of law." *Id.* at 263, 494 P.3d at 811 (quoting *Turcott*, 165 Idaho at 188, 443 P.3d at 202). This Court has also explained that " 'the appropriate standard of

15

review is not simply a consequence of the substance of the underlying dispute,' but rather, 'this Court must consider the procedural posture in which a case arrives for review to decide the standard of review.' " *Huber v. Lightforce USA, Inc.*, 159 Idaho 833, 845, 367 P.3d 228, 240 (2016) (quoting *Goodman v. Lothrop*, 143 Idaho 622, 625, 151 P.3d 818, 821 (2007)) (applying the summary judgment standard of review to a ruling made at summary judgment, prior to a bench trial).

"This Court reviews a trial court's decision to award attorney fees and costs under an abuse of discretion standard." *A.C. & C.E. Invs., Inc. v. Eagle Creek Irrigation Co.*, 173 Idaho 178, ___, 540 P.3d 349, 357 (2023) (quoting *Geringer Cap. v. Taunton Props., LLC*, 172 Idaho 95, 100, 529 P.3d 760, 765 (2023)). When reviewing a discretionary decision for an abuse of discretion, this Court determines whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

### III. ANALYSIS

The Attorney General assigns three points of error to the district court's rulings at critical stages of the proceedings below. If the Attorney General is correct, these alleged errors were consequential because they incorrectly defined the legal standards that the district court applied in its rulings on discovery, on summary judgment, and following the bench trial. Thus, they would have tainted the court's legal analysis at every key phase of the proceedings. For the reasons explained below, we agree with the Attorney General's analysis.

**A. The district court erred in denying the Attorney General's motion to amend its complaint on the grounds that an expanded claim it asserted did not relate back.**

After the filing of the Complaint, the Board moved to dismiss the Complaint on various grounds. In response, the Attorney General filed an Amended Complaint as a matter of right pursuant to Rule 15(a)(1) of the Idaho Rules of Civil Procedure. In addition to the claims in the original Complaint based on the alleged open meetings violation from the May 15, 2023, executive session, the Amended Complaint included two additional grounds for voiding and nullifying the Board's May 18, 2023, action: (1) a new claim based on inadequate notice in the published agenda for the May 18, 2023, public meeting and (2) an expanded claim based on an open meetings violation stemming from the April 25, 2023, meeting. Thereafter, the Board moved for summary

16

judgment and asserted that the amendments failed to comply with the 30-day limitation within Idaho Code section 74-208(6) because they did not "relate back" to the original complaint. Idaho Code section 74-208(6) limits the time for challenging a government board's decision by requiring that:

> Any suit brought for the purpose of having an action declared or determined to be null and void pursuant to [Idaho Code section 74-208(1)] shall be commenced within thirty (30) days of the time of the decision or action that results, in whole or in part, from a meeting that failed to comply with the provisions of this act.

I.C. § 74-208(6). The Board argues that although the Attorney General's original Complaint was filed within this 30-day requirement, the Amended Complaint was brought after the commencement deadline had passed. The Attorney General, while acknowledging that the new claims were filed after the 30-day window, maintains that they related back to the original Complaint; thus, they were timely brought.

In its ruling, the district court concluded that the new claims were time-barred because they were filed after the statutory 30-day window, and that the claims did not "relate back" under Rule 15(c)(1)(B). That rule provides in relevant part:

> **(c) Relation Back of Amendments.**
>
> (1) *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:
>
> . . . .
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out, or attempted to be set out, in the original pleading[.]

I.R.C.P. 15(c)(1)(B) (emphasis in original). The district court recognized that notice is a "key consideration" in determining whether an amendment relates back. The district court explained:

> A key consideration is whether the defendant was "put on notice" during the limitations period "regarding the claim . . . raised by the amended pleading." . . . "[I]f the alteration of the original pleading is so substantial that it cannot be said that defendant was given adequate notice of the conduct, transaction, or occurrence that forms the basis of the new claim . . . , then the amendment will not relate back . . . and will be time barred if the limitations period has expired."
>
> . . . Attorney General Labrador's original complaint mentions the agenda but simply fails to notify the Board of Regents of any challenge to either the adequacy of its content or the manner of its posting. Hence, the [c]ourt determines, in its discretion, that the agenda claim does not relate back.

(Quoting 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1497 (3d ed. Apr. 2023)).

Later in the district court's Memorandum Decision and Order, the court explained that it relied on the same rationale for concluding that claims related to the April 25, 2023, meeting did not relate back. The district court explained:

> For the same reasons the agenda claim does not relate back to the date of the amended complaint, neither does the claim of an unlawful executive session during the April 25 meeting. The amended complaint's claim of an unlawful executive session during the April 25 meeting is no mere amplification of the original complaint's claim of an unlawful executive session during the May 15 meeting. Instead, it is an entirely separate and independent basis for seeking nullification of the approval given by the Board of Regents during the May 18 meeting for the University of Phoenix acquisition.

Since it is undisputed that the Complaint was amended as a matter of right under Rule 15(a)(1), the question presented on this issue is not one of discretion, but of interpretation—i.e., whether the amendments related back under Rule 15(c). This Court interprets its own rules by using a similar approach to how it interprets statutes. *Valentine v. Valentine*, 169 Idaho 621, 627, 500 P.3d 514, 520 (2021). As with statutes, the analysis of court rules begins with the plain language of the rule, read according to its "plain, obvious and rational meaning." *Id.* (quoting *Kelly v. Kelly*, 165 Idaho 716, 724, 451 P.3d 429, 437 (2019)). However, since this Court authors the rules, we are "not constrained by the constitutional separation of powers" that require strict adherence to the plain language of a statute regardless of the result. *State v. Montgomery*, 163 Idaho 40, 44, 408 P.3d 38, 42 (2017). Additionally, in the context of the Idaho Rules of Civil Procedure, the rules are "construed and administered to secure the just, speedy and inexpensive determination of every action and proceeding." I.R.C.P. 1(b).

The question here is relatively straightforward: whether the claims the Attorney General attempted to add in the Amended Complaint "arose out of the conduct, transaction, or occurrence set out, or attempted to be set out, in the original pleading[.]" I.R.C.P. 15(c)(1)(B). We agree with the district court that the failure of notice claim regarding the May 18, 2023, public meeting did not relate back because it was not mentioned or even hinted at in the original pleading. However, we conclude that the district court erred in ruling that the additional claim concerning the propriety of the April 25, 2023, executive session meeting did not relate back.

In the original Complaint, the Attorney General expressly states that the Board "held three executive sessions on March 22, 2023, April 25, 2023, and May 15, 2023, to consider this proposed acquisition." An entire page of the Complaint related to the April 25, 2023, executive session. In fact, it references that meeting at least six times in the main body of the document. Importantly, the basis of the claim in the Amended Complaint was predicated on the same legal theories raised in the original Complaint—a violation of the Open Meetings Law by improperly meeting in an executive session. The April 25, 2023, meeting was an "occurrence" specifically set out in the original Complaint, and the amended claim arose directly out of that occurrence; for that reason, the claim properly relates back. Therefore, the district court erred in concluding that the expanded claim relating to the April 25, 2023, executive session did not relate back.

**B. The district court erred in interpreting "preliminary negotiations," as used in Idaho Code section 74-206(1)(e), as "encompass[ing] all negotiations preliminary to contracting."**

The Idaho Open Meetings Law, codified in Idaho Code sections 74-201 to 74-208, requires governing bodies of state and local agencies to hold meetings that are open to the public. The legislature declared "that it is the policy of this state that the formation of public policy is public business and shall not be conducted in secret." I.C. § 74-201. However, there are a few enumerated exceptions to the requirement for open meetings. The exception at issue in this appeal is set forth in Idaho Code section 74-206(1)(e), which permits an "executive session" to be closed to the public when necessary "[t]o consider preliminary negotiations involving matters of trade or commerce in which the governing body is in competition with governing bodies in other states or nations[.]" I.C. § 74-206(1)(e).

In interpreting this exception to the presumption of openness, the district court concluded that the legislature intended " 'preliminary negotiations,' as used in section 74-206(1)(e), to encompass *all negotiations* preliminary to contracting." (Emphasis added). Thus, under the district court's reading, when the competition element is satisfied, governing bodies are free to go into an executive session to deliberate in secret on all matters prior to the execution of a contract, so long as any final action to execute a contract is taken at a public meeting. For the reasons explained below, we disagree.

19

***1.*** ***The canons of construction, coupled with the statutory context of the phrase, show that "preliminary negotiations" does not mean "all negotiations"; instead, it means a phase of negotiations preliminary to final negotiations.***

As an initial matter, the phrase "preliminary negotiations" is not a term of art with a universally understood meaning. Black's Law Dictionary defines "Preliminary" as "[c]oming before and usu[ally] leading up to the main part of something happening before something that is more important, often in preparation for it <preliminary negotiations>." *Preliminary*, BLACK'S LAW DICTIONARY (11th ed. 2019). *Cf.* 17A Am. Jur. 2d *Contracts* § 36 (discussing preliminary negotiations). While applying this definition does not resolve the question here, it is illustrative of the issues presented in this appeal because "the main part of something happening" could plausibly reference other negotiations or the execution of the contract. Put another way, the issue in this case is whether "preliminary negotiations" is a reference to (a) *all* negotiations *preliminary to the contract* or (b) just a *preliminary stage* of negotiations.

The district court found that the Attorney General's interpretation, which narrowly defined the term to mean a stage in the negotiations preliminary to final negotiations, was "reasonable" even though the district court ultimately rejected it. The district court explained:

> Attorney General Labrador identifies no historical legal usage, in any context, of the noun phrase "preliminary negotiations" to mean what he says it means here. Still, the [c]ourt supposes, his interpretation is reasonable too. After all, the adjective "preliminary," considered separately from the noun it modifies, means "coming before and usually forming a necessary prelude to something else." *Preliminary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ preliminary (last visited Nov. 8, 2023). The "something else" that preliminary negotiations "com[e] before" and "form[] a necessary prelude to" could be, as a matter of plain English, final negotiations, as Attorney General Labrador says.
>
> Despite his argument to the contrary, though, the "something else" that preliminary negotiations "com[e] before" and "form[] a necessary prelude to" also could be reaching an agreement.

(All but first alteration in original; footnote omitted). The district court proffered a hypothetical to support its view:

> Consider the sentence, "After engaging in preliminary negotiations, the parties reached an agreement." That sentence does not confuse or even surprise the reader by making no mention of final negotiations. On the contrary, it is perfectly normal English usage—much more natural than the alternative sentence, "After engaging in preliminary negotiations, the parties advanced to final negotiations."

20

While the analysis and analogy are well taken, it must be remembered that the limited statutory context in which the term "preliminary negotiations" is used in Idaho Code section 74-206(1)(e) is different from the district court's broader hypothetical. The statute creates a narrow exception to the normal rule of openness to allow a governing body to enter into an executive session: "To consider preliminary negotiations *involving matters of trade or commerce* in which the governing body is in competition with governing bodies in other states or nations[.]" I.C. § 74-206(1)(e) (emphasis added). Thus, this provision does not provide an exception for *all* preliminary negotiations in *all* matters; rather, it provides only a narrow exception for preliminary negotiations *in commercial transactions*. Thus, contrary to the district court's suggestion, there are instances, at least in the eyes of the Idaho Legislature, where the distinction between preliminary and final negotiations is far more nuanced than just determining whether they occurred before or after the contract was executed.

Perhaps the biggest concern raised by the district court's interpretation of section 74-206(1)(e) is that it essentially reads the word "preliminary" out of the statute. This violates a well-known rule of construction that cautions against reading a statute so that certain terms become meaningless. We have explained that we "will not construe a statute in a way which makes mere surplusage of provisions included therein." *Darrow v. White*, 172 Idaho 272, 280, 531 P.3d 1169, 1177 (2023) (quoting *Sweitzer v. Dean*, 118 Idaho 568, 572, 798 P.2d 27, 31 (1990)). Further, "[i]t is incumbent upon this Court to interpret a statute in a manner that will not nullify it, and it is not to be presumed that the legislature performed an idle act of enacting a superfluous statute." *Id.* (quoting *Sweitzer*, 118 Idaho at 572, 798 P.2d at 31). The district court's reading requires this Court to ignore the term "preliminary" and presume that the legislature's use of that word in the statute was superfluous, even though the legislature used the phrase "all negotiations" elsewhere in the Idaho Open Meetings Law. *See* I.C. § 74-206A(1) ("All negotiations between a governing body and a labor organization shall be in open session and shall be available for the public to attend."). Inasmuch as the legislature has already made a distinction between "preliminary negotiations" and "all negotiations" within the body of the Idaho Open Meetings Law itself, we decline to construe it in such a way that makes this distinction meaningless—especially when such a reading is contrary to the policy of openness expressed by the legislature. *See, e.g.*, I.C. §§ 74-201, 74-203(1), 74-206(2), 74-207.

It is undisputed that the negotiations at issue here concerned a complex, commercial transaction that took place over several months and passed through several intermediate stages. The record reveals that there were at least three[12] documents exchanged by the parties *prior* to the May 18, 2023, public meeting: a nondisclosure agreement, an IOI, and a term sheet.[13] All of the documents were important milestones in the negotiating process leading up to the Asset Purchase Agreement. The slide presentations suggest that there were many other interim steps and decisions presented to the Board that required their immediate action.

In complex business transactions of this character, it is well understood that there are "stages" to negotiations. For example, *Black's Law Dictionary* defines a Letter of Intent as "[a] written statement detailing the *preliminary understanding* of parties who plan to enter into a contract or some other agreement; a noncommittal writing *preliminary to a contract*." *Letter of Intent*, Black's Law Dictionary (11th ed. 2019) (emphasis added); *see also Preliminary Agreement*, Black's Law Dictionary (11th ed. 2019).

The Seventh Circuit explained that preliminary agreements "set the stage for negotiations on details." *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 426 (7th Cir. 1989) ("The shoals that wrecked this deal are common hazards in business negotiations. Letters of intent and agreements in principle often, and here, *do no more than set the stage for negotiations on details*. Sometimes the details can be ironed out; sometimes they can't. Illinois . . . allows *parties to approach agreement in stages*, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics." (emphasis added)). This is consistent with the Attorney General's interpretation of Idaho Code section 74-206(1)(e) and the understanding that commercial transactions are negotiated in stages.

Practice-area-specific legal scholarship also aligns with this common understanding that complex commercial transactions are negotiated in stages. As one article expressly states:

> In other words, *letters of intent allow parties to a business deal to structure their negotiations in stages*. Letters of intent allow both sides to move ahead in a cautious manner without, in most cases, unconditionally binding each to the other.

---

[12] There may be a fourth document since there are at least two references to an LOI in the record, although the record is not clear whether an LOI was ever exchanged or executed between the parties. It is also uncertain whether the lack of an LOI in the record is due to its non-existence, an oversight, or a direct result of the district court's ruling that limited discovery.

[13] These are all subsets of "Preliminary Agreement." *See Preliminary Agreement*, Black's Law Dictionary (11th ed. 2019) ("**preliminary agreement** A precontractual understanding in which two commercial parties allocate their contributions to an undertaking but do not specify all the important terms of the deal.").

Step by step, the parties can conduct the necessary due diligence and agree on all the terms of their relationship before locking into a binding agreement to consummate the transaction. Letters of intent also help flush out potential deal-breaking issues early on in the negotiation process.

Thomas C. Homburger & James R. Schueller, *Letters of Intent—A Trap for the Unwary*, 37 Real Prop. Prob. & Tr. J. 509, 511 (2002) (emphasis added); *accord* Georgette C. Poindexter, *Letters of Intent in Commercial Real Estate*, 28 Real Est. L.J. 195 (2000); Jesse Max Creed, *Integrating Preliminary Agreements into the Interference Torts*, 110 Colum. L. Rev. 1253 (2010) ("Preliminary agreements have become a common tool in sophisticated negotiations for dealing with a complicated and indeterminate state of the world. Modern courts have recognized them as *an intermediate stage of contracting* during which certain obligations attach to the conduct and behavior of both parties." (emphasis added)).

While the record does not disclose whether an "LOI" or "Letter of Intent" was ever exchanged between the parties—although it is mentioned in the record that one was anticipated—the parties appear to agree that there was an "IOI" or "Indication of Interest." Although Black's Law Dictionary does not define an IOI, it is similar in form to an LOI but used as a party's first indication of where they are on certain terms, allowing a seller to evaluate with whom it wants to negotiate further, especially when an asset goes to market without a listed price. As one example, in *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, a Texas case that involved a similar process, Morgan Stanley (like the University of Phoenix through Tyton Partners here) invited parties to bid on an asset. 309 S.W.3d 635, 637 (Tex. App. 2010). After receiving an invitation, the parties submitted an IOI. *Id.* The court explained that the IOI permitted the "narrowing" of bids before entering "final PSA negotiations":

> Morgan Stanley issued a "Teaser," inviting interested parties to potentially bid on an individual asset or certain assets combined. After WTG signed a confidentiality agreement, Morgan Stanley gave WTG a Confidential Information Memorandum ("CIM"), which described the assets in more detail and outlined the progressive steps of the transaction process: interested parties submit a non-binding Indication of Interest ("IOI") containing requisite items; Morgan Stanley and ConocoPhillips will evaluate the IOIs and invite a limited number of bidders to attend a management presentation, participate in due diligence, receive further information, including a draft Purchase and Sale Agreement ("PSA"), and attend a site visit from which to submit bids; and upon evaluation of the final bids, Morgan Stanley will narrow the number of bidders and *enter into final PSA negotiations*.

*Id.* (emphasis added). This framework and the court's analysis are not only consistent with the conclusion that there are "stages" to negotiations in the commercial merger and acquisition context, but it also establishes that there is a recognized distinction between preliminary and final negotiations that exists *prior to* signing a purchase agreement.[14]

> Returning to the district court's analogy in this case, the district court explained:

> "After engaging in preliminary negotiations, the parties reached an agreement." That sentence does not confuse or even surprise the reader by making no mention of final negotiations. On the contrary, it is perfectly normal English usage—much more natural than the alternative sentence, "After engaging in preliminary negotiations, the parties advanced to final negotiations."

Based on our review of persuasive authority and practice-area-specific legal scholarship, we disagree with the district court's assessment. In the business world, it would not be unusual to say "after engaging in preliminary negotiations, the parties advanced to final negotiations" prior to signing an asset purchase agreement. *See WTG Gas Processing, L.P.*, 309 S.W.3d at 637 ("Morgan Stanley and ConocoPhillips will evaluate the IOIs and invite a limited number of bidders . . . [and] will narrow the number of bidders and *enter into final PSA negotiations*." (emphasis added)).

In reaching its decision, the district court suggested that this Court has applied the noun phrase "preliminary negotiation" in the manner urged by the Board: "Many times, in other contexts, the Idaho Supreme Court has used this same noun phrase to mean *all negotiations* preliminary to signing a written contract, not early negotiations preliminary to final negotiations." (Emphasis added) (Citing *Valley Bank v. Christensen*, 119 Idaho 496, 498, 808 P.2d 415, 417 (1991)). As qualified by the district court, this distinction may be found in "other contexts." In *Valley Bank*, this Court was applying the parole evidence rule to an oral guarantee of a loan with a total value of $15,000. 119 Idaho at 497, 808 P.2d at 416. Aside from the nature and amount of the transaction at issue being vastly different in character, the question at issue was different as well. At issue in that case was whether a guaranty was included in the *final contract* or if the discussions of the guaranty were merely "[o]ral stipulations, agreements, and negotiations *preliminary to a written contract*" that were presumed merged in the executed agreement. *Id.* at 498, 808 P.2d at 417 (alteration in original) (emphasis added). Whether a term is included *within*

---

[14] The dissent criticizes the majority for improperly "importing" a "phased approach" to negotiations from "treatises, law review articles, and caselaw from two other jurisdictions." Yet, we have merely recognized the reality of commercial business dealings, especially complex transactions like the one at issue here, involving hundreds of millions of dollars. In such high stakes transactions, the negotiations are necessarily more sophisticated and often take place in phases, making them far more complex than dickering over the price of a used automobile at a dealership.

a contract is a binary inquiry—it is either part of the agreement of the parties or not. The question here, however, concerns whether there is a preliminary stage of a complex business transaction and what was required to be discussed, deliberated, and determined at an open public meeting. Thus, the district court's reliance on *Valley Bank* is misplaced.

Commercial transactions can come in different forms with binding and non-binding agreements exchanged at different points in the negotiation process. However, a common thread in commercial transactions is the point where a precontractual understanding of the basic terms of the deal is reached and the parties shift their focus to finalizing the details. Since not all transactions follow the same formula, and there is no uniformity in the terms attorneys affix to the documents they draft, we cannot merely draw lines based on common business terms like IOI, LOI, or even MOU ("memorandum of understanding"). To do so would run the risk that parties would name documents solely with the intent to qualify for an executive session, regardless of the document's function or purpose. Thus, rather than focusing on the type of documents used or the titles given them, the inquiry should be focused on when the preliminary phase of negotiations ends and the parties shift to the later stages of negotiations.[15] Or, as stated above, when the parties reach a precontractual understanding of the general terms from which the parties will continue to negotiate on the final details. This, of course, requires a case-by-case examination of the facts, which was not undertaken in this case due to (1) the trial court's broad interpretation of "preliminary negotiations" to mean "all negotiations," and (2) its resulting order severely limiting discovery.

Taken together, the common understanding of "preliminary negotiations" in a commercial transaction, as contemplated by the statute, suggests that Idaho Code section 74-206(1)(e) only applies to a phase of negotiations preliminary to the final negotiations, and not all negotiations. For example, while sending an IOI might signal a commencement of preliminary negotiations and indicate no more than a desire to investigate further, an LOI could possibly imply a level of commitment that precedes final negotiations. Alternatively, an IOI may be of sufficient detail that agreeing in principal to the terms provided therein could signal the beginning of final negotiations. This type of determination is highly fact sensitive, may vary in different cases based on the course

---

[15] *See Preliminary Agreement*, Black's Law Dictionary (11th ed. 2019) ("A precontractual understanding in which two commercial parties allocate their contributions to an undertaking but do not specify all the important terms of the deal."); 157 Am. Jur. *Trials* 281 (2018) ("A letter of intent, which has been defined as a *written statement detailing the preliminary understanding of parties* who plan to enter into a contract or some other agreement, typically provides an outline for a final transaction or a basis for drafting final transaction documents." (emphasis added)).

of the dealings, and typically requires discovery before the trier of fact can make a reasoned finding.

### 2. *The legislature's public policy objectives, as set forth in the Act, militate against applying a broad interpretation of the phrase "preliminary negotiations."*

The public policy objectives plainly expressed within the Idaho Open Meetings Law, coupled with the applicable canons of statutory construction we must apply, also support the Attorney General's reading of Idaho Code section 74-201. For example, the first section of Idaho's Open Meetings Law explains that "the legislature finds and declares that it is the policy of this state that the formation of public policy is public business and shall not be conducted in secret." I.C. § 74-201. Further, as set forth within the provision authorizing executive sessions as an exception to the public meeting requirement, "[t]he exceptions to the general policy in favor of open meetings stated in this section *shall be narrowly construed*." I.C. § 74-206(2) (emphasis added). Given this broad purpose and clear mandate for construction of the Act, when faced with two reasonable interpretations of the Idaho Open Meetings Law, the construction favoring open meetings should be applied. *See State ex rel. Black v. State Bd. of Educ.*, 33 Idaho 415, 429, 196 P. 201, 205 (1921) ("When a constitutional provision or legislative act is fairly open to two constructions, one of which will carry out and the other defeat some great public purpose for which it was designed, the former construction should be applied.").

The dissent argues that the majority has effectively dismissed one stated policy purpose of the statute (to "protect a state agency's competitive advantage" in a narrow set of circumstances) at the cost of another stated policy purpose (to broadly promote openness in government). The problem with the dissent's interpretation is that it allows a narrow exception to swallow the general rule of transparency. Indeed, the dissent endorses the broadest possible interpretation of "preliminary negotiations" by shielding *all negotiations* prior to signing the contract from the public at the expense of the Act's primary purpose—to ensure that "the formation of public policy . . . shall not be conducted in secret." I.C. § 74-201. This would effectively allow an agency to circumvent the Act by secretly negotiating a deal behind the scenes and then holding a perfunctory public vote to give the appearance that it had complied with the statute. The plain language of the Act directs us to resist such a result.

### 3. The legislative history of the Idaho Open Meetings Law and its amendments firmly supports a narrow construction of its exceptions.

Bolstering our conclusion, legislative history wholly supports the conclusion that "preliminary" refers to a phase of negotiations. The Idaho Open Meetings Law was first enacted in 1974.[16] Act of Apr. 2, 1974, ch. 187, 1974 Idaho Sess. Laws 1492–95. As originally enacted, an executive session could be held "to consider matters of trade or commerce." *Id.*, ch. 187 § 6(1)(e), 1974 Idaho Sess. Laws at 1494. Under this exception, all phases of the acquisition—both preliminary and final—could have transpired in an executive session. However, this provision was amended a few years later, in 1977, so that the "trade or commerce" exception now only applies to "preliminary negotiations . . . in which the governing body is in competition with governing bodies in other states or nations." Act of Mar. 29, 1977, ch. 173 § 3, 1977 Idaho Sess. Laws 445, 446; I.C. § 74-206(1)(e).

The 1977 meeting minutes of the House State Affairs Committee are particularly informative regarding the purpose behind this change. The House State Affairs Committee took up the provision at issue here on February 14, 1977. The meeting minutes explain:

> Rep. Ingram remarked that he thought the press had been unfair in its criticism of the Committee in holding this RS. It was not that the Committee was unfriendly to Open Meetings; it was agreed that some changes needed to be made before action. He went on to explain that the language he now wishes to insert in the RS was originally given to him by the Lewiston Port authorities, as follows: " . . . to consider preliminary negotiations involving matters of trade or commerce in which the governing body is in competition with other governing bodies and other states." *This would be pretty exclusive for the Port of Lewiston and should solve our problem.*

*Idaho Open Meetings Act: Feb. 14, 1977, Hearing on RS 1681C2 (HB 257) Before the H. State Affairs Comm.*, 44th Leg., 1st. Reg. Sess. (Idaho 1977) (emphasis added) (reference to statement of Representative Ingram). Interestingly, the dissent quotes from the comments of Representatives Ingram and Hosack at the hearing to establish that the legislature intended to provide a broad exception to openness in order to create a competitive advantage for all state agencies, even though Representative Ingram clearly believed that the exception they approved "would be pretty exclusive for the Port of Lewiston . . . ." *Id.*

---

[16] The Idaho Open Meetings Law was originally located in Title 67, but in 2015 the act was moved to Title 74 to consolidate the laws related to transparent and ethical government. *See* Act of Mar. 26, 2015, ch. 140, 2015 Idaho Sess. Laws 344–78 (codified at I.C. §§ 74-101 through 74-511).

Based on this legislative history, it is clear that the 1977 Legislature was attempting to remedy widespread abuse of the executive session exception. To remedy this, the original draft sought to eliminate this exception altogether. While the final version resulted from a compromise after concern from the Port of Lewiston, the purpose of the amendment was to significantly limit this exception, not broaden it. To that end, the reading of the district court would render the 1977 amendments meaningless. Idaho Code section 74-206(3), which is unchanged since its original enactment, provides: "No executive session may be held for the purpose of taking any final action or making any final decision." The exception at issue here *has never permitted* an executive session for final action. Under the district court's reading, the inclusion of "preliminary negotiations" in the 1977 amendment would have no legal significance. This cannot be. As we have said: "[i]t is the long standing rule in this state that when the legislature amends a statute it is deemed, absent an express indication to the contrary, to be indicative of *changed legislative intent.*" *Saint Alphonsus Reg'l Med. Ctr. v. Gooding County*, 159 Idaho 84, 89, 356 P.3d 377, 382 (2015) (alteration and emphasis in original) (quoting *Nebeker v. Piper Aircraft Corp.*, 113 Idaho 609, 614, 747 P.2d 18, 23 (1987); and citing *Lincoln County v. Fid. & Deposit Co. of Md.*, 102 Idaho 489, 491, 632 P.2d 678, 680 (1981)).

The 1977 amendments also included a new section spelling out violations. As originally enacted: "VIOLATIONS. Any action taken at a meeting which fails to comply with the [Idaho Open Meetings Law] shall be null and void." Act of Mar. 29, 1977, ch. 173 § 5, 1977 Idaho Sess. Laws at 447. This Court had the opportunity to apply this provision in *State ex rel. Roark v. City of Hailey*, which involved an action brought by the Blaine County prosecutor against the City of Hailey for a purported violation of the Idaho Open Meetings Law after the city passed an annexation ordinance. 102 Idaho 511, 633 P.2d 576 (1981). The Court held by a 4 to 1 majority that since no "binding decision" had taken place behind closed doors, such deliberations were properly deemed by the trial court "preliminary to final action." *Id*. at 513–14, 633 P.2d at 578–79. As this Court explained:

> This is not a case where a public body arrived at a secret, binding decision in closed session, later reemerging to public view to enter a ceremonial, pro forma final decision. To the contrary, the district court found as a matter of fact that none of the council members, even those opposed to the proposal, considered themselves bound by the opinions expressed at the March 21st meeting. There was no evidence of sham or deception on the part of any council member. The annexation ordinance was passed only after discussion at three public hearings conducted by the planning

and zoning commission and five public hearings conducted by the city council. The trial court further found that citizens had ample opportunity to and did express their views at such meetings, and that these views were given earnest consideration by the council. Finally, the trial court found that nothing in the council's deliberations were withheld or kept secret from the public by the council or anyone else. The above findings, not contested on appeal, amply support the trial court's conclusion that the deliberations conducted at the four work sessions, as well as the opinions expressed at the March 21st session, were merely preliminary to final action.

*Id.* Justice Bistline dissented, noting that

No one argues that the purpose of the Act is to provide citizen access only to meetings at which decisions are announced, or even to provide citizen access to some, but not all, of the meetings at which matters which come within the purview of the Act are considered. The purpose is, of course, to provide access to all meetings within the purview of the Act." [17]

*Id*. at 515, 633 P.2d at 580 (Bistline, J., dissenting).

The provision at issue in *City of Hailey* was amended by the legislature in 1992 to its current form in Idaho Code section 74-208, which reads: "VIOLATIONS: (1) If an action, or *any deliberation or decision-making that leads to an action*, occurs at any meeting which fails to comply with the provisions of [the Idaho Open Meetings Law], such action shall be null and void." (Emphasis added). This change is substantial. Prior to the amendment, a violation occurred when an *action* was taken at a meeting in violation of the Idaho Open Meetings Law. Under *City of Hailey*, since the binding action took place at the public meeting, this Court concluded that there was no violation. This made it easy for government bodies to skirt the intent of the statute by reaching an agreement behind the scenes and then merely go through the formality of holding a public vote to comply with the statute—rendering the public actions as merely perfunctory. However, the 1992 amendment expands the meaning of the term "violation" beyond final *actions*, so that it now includes "*deliberations or decision making that leads to an action*," which addresses the concerns of Justice Bistline's dissent in *City of Hailey*. I.C. § 74-208(1) (Emphasis added).

---

[17] In his dissenting opinion, Justice Bistline further explained: "This case presents this Court with its first opportunity to construe Idaho's Open Meetings Act (Sunshine Law), I.C. § 67-2340 et seq. Unfortunately[,] the Court seizes the opportunity not to further the purposes of the Act, but to render it practically meaningless." *City of Hailey*, 102 Idaho at 515, 633 P.2d at 580 (Bistline, J., dissenting). Four years later, Justice Bistline, in a concurring opinion, expressed his frustration that he had to "re-read" this Court's majority opinion in *City of Hailey*: "It is regrettable, too, in that it has caused me to re-read *Hailey* and experience recurring dismay at this Court's frustration of the prosecuting attorney's attempt to implement the legislative mandate of open meetings. Even more regrettable is it to note that the legislatures convening since *Hailey* have not reciprocated the Blaine County prosecutor's efforts at applying their law." *Gardner v. Sch. Dist. No. 55*, 108 Idaho 434, 440–41, 700 P.2d 56, 62–63 (1985) (Bistline, J., specially concurring).

29

The legislative history of the 1992 amendment is particularly relevant to the actions and deliberations in the case at hand, especially given Finkelstein's deposition testimony that "the mechanical actions that followed [the May 15 executive session] were [President Green] indicating that *the deal was, ostensibly through our lens, was approved*, and then we had this kind of sprint to activate now between that moment and getting to a fully signed agreement to qualify for the deadlines that we were cooperatively chasing." (Emphasis added). If true, this would strongly suggest that the Board had essentially approved the plan and that any subsequent public meetings were merely pro forma, ratifying an agreement that had already been approved in private.

### 4.    *Conclusion*

Contrary to the Open Meetings Law's preference for sunshine, the district court's reading of the preliminary negotiation clause effectively cloaks all negotiations and actions taken prior to a final public vote in shadow by broadening the very exceptions that the legislature required be narrowly construed. I.C. § 74-206(2) ("The exceptions to the general policy in favor of open meetings stated in this section shall be narrowly construed."). As applied in this case, the court's discovery rulings not only hampered the Attorney General in performing its statutory duty to enforce the Idaho Open Meetings Law, I.C. § 74-208(5), but it also concealed the details of what transpired at the meetings from public view. As observed by Louis Brandeis, who would go on to serve as Associate Justice of the Supreme Court of the United States: "[p]ublicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914). The wisdom of mandating such publicity through sunshine laws falls squarely within the Idaho Legislature's prerogative.

For all these reasons, we conclude that the district court erred in its conclusion that the phrase "preliminary negotiations" encompasses all negotiations. Despite the district court's conclusion to the contrary, understanding "preliminary negotiations" in the context of the phases of commercial transactions provides a workable solution. Preliminary negotiations are the stage of commercial negotiations up to the point when the parties reach a precontractual understanding of the general terms—such as the scope of the purchase and the purchase price—from which the parties will continue to negotiate, incur costs for due diligence, and work out the final details. Such a precontractual understanding as to the general terms of the transaction would need approval at a public meeting prior to financial expenditure and no further executive session could be taken under

30

this exception at that point, as the negotiations had moved beyond the preliminary stage of negotiations. Ultimately, the district court broadly construed *an exception* to the requirement for open meetings and disregarded the legislature's expressly stated public policy. By construing the exception in this manner, the district court's reading permits all decision-making deliberations leading to agency action to be held in secret throughout the entirety of a commercial negotiation process.

The dissent raises concerns that the fact sensitive, case-by-case approach formulated by the majority may somehow render the statute unconstitutionally vague. "The void-for-vagueness doctrine is premised upon the due process clause of the Fourteenth Amendment to the U.S. Constitution." *State v. Cook*, 165 Idaho 305, 309, 444 P.3d 877, 881 (2019) (quoting *State v. Korsen*, 138 Idaho 706, 711, 69 P.3d 126, 131 (2003), a*brogated on other grounds by Evans v. Michigan*, 568 U.S. 313 (2013)). Thus, the dissent inserts a new a constitutional argument to this case by raising the specter that our interpretation of the statute might somehow violate the due process rights of government agencies. However, the dissent fails to establish that agencies are entitled to the protections of due process in a way that would allow them to challenge a law as unconstitutionally vague. Due process protects "persons" and "citizens" from government action; however, it does not protect state government entities from state government action. U.S. Const. amend. XIV, § 1; Idaho Const. art. I, § 13; *see generally Hunter v. City of Pittsburgh*, 207 U.S. 161, 178–79 (1907). Therefore, by holding that the determination of whether certain government acts constitute "preliminary negotiations" is best decided on a case-by-case basis—after the trial court and the parties have the benefit of full discovery—the majority has not tread upon any cognizable constitutional right of a state agency.

Given the highly nuanced nature of such high stakes negotiations, it would not be possible for a trier of fact to determine whether the negotiations were purely preliminary without permitting discovery as to the nature and content of those negotiations, and the private meetings which authorized them. Because there is simply too much left unknown, undiscovered, and unaddressed about Project Neptune, there remain too many genuine issues of material fact for us to agree with the district court's decision on summary judgment. Accordingly, we vacate the district court's grant of summary judgment and its order limiting discovery. To be clear, in so doing we have not concluded that the Open Meetings Law was violated by the Board. We merely hold that the district court applied the wrong legal standard on summary judgment due to a misinterpretation of the

31

relevant statute. Thus, we remand this matter for complete discovery and further consideration on summary judgment or at trial to determine whether the parties improperly held executive sessions after the negotiations advanced beyond the preliminary stage.

**C. The district court erred in ruling that the phrase "is in competition with" in Idaho Code section 74-206(1)(e) implies a "reasonable belief" standard that is not set forth in the statute.**

The Attorney General also assigns error to the district court's interpretation of the Idaho Open Meetings Law's exception for competitive negotiations. *See* I.C. § 74-206(1)(e). This provision contains an exception to the public meeting requirement for a governing body to meet in executive session "[t]o consider preliminary negotiations involving matters of trade or commerce in which the governing body *is in competition with governing bodies in other states or nations*[.]" I.C. § 74-206(1)(e) (emphasis added). The Attorney General maintains that as of April 24, 2023, members of the University and possibly the Board were aware that they were no longer in competition with the University of Arkansas, or any other governing body for that matter; thus, they could no longer rely on this narrow exception as a justification for the executive sessions on April 25 and May 15.

The district court concluded that the phrase "is in competition with" is satisfied if a governing body "reasonably believes" it is in competition with another governing body. The district court explained:

> Left is the middle-ground interpretation the [c]ourt offered during the hearing on the Board of Regents' motion for a protective order: a subjective standard applies, under which section 74-206(1)(e) is satisfied if a governing body, based on the information it has at the time of an executive session, reasonably believes it is in competition with another governing body. Under this interpretation, a governing body's perception of "an aura of competition," to use Attorney General Labrador's turn of phrase, is not good enough, but actual competition is not required. The [c]ourt believes the legislature must have intended this interpretation.

On appeal, the Attorney General argues that the district court erred by expanding the exception because the plain language of the statute requires that competition actually exists. In the Attorney General's view, reading the words "a reasonable belief" into the statute is tantamount to a judicial rewriting of an otherwise plain and unambiguous text. We agree.

This Court has previously explained that "[i]ssues of statutory interpretation are questions of law which are reviewed by this Court de novo." *State, Dep't of Health & Welfare v. Doe (2022-32)*, 171 Idaho 677, 680, 525 P.3d 715, 718 (2023) (first citing *Smith v. Kount, Inc.*, 169 Idaho

460, 463, 497 P.3d 534, 537 (2021); and then citing *State v. Schultz*, 151 Idaho 863, 865, 264 P.3d 970, 972 (2011)). "This Court 'begins with an examination of the literal words of a statute,' and gives words 'their plain, usual, and ordinary meanings.' " *Hastings v. Idaho Dep't of Water Res.*, 173 Idaho 630, ___, 547 P.3d 1190, 1197 (2024) (quoting *St. Luke's Health Sys., Ltd. v. Bd. of Comm'rs of Gem Cnty.*, 168 Idaho 750, 756, 487 P.3d 342, 348 (2021)). "When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction." *Id.* (quoting *St. Luke's Health Sys., Ltd.*, 168 Idaho at 756, 487 P.3d at 348).

Importantly, this Court applies an unambiguous law as written: "[i]f the statute is not ambiguous, this Court does not construe it, but simply follows the law as written." *Montierth v. Dorssers-Thomsen*, 173 Idaho 100, ___, 539 P.3d 578, 590 (2023) (quoting *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 893, 265 P.3d 502, 506 (2011)). That is because, "[i]f this Court were to conclude that an unambiguous statute was palpably absurd, how could we construe it to mean something that it did not say? Doing so would simply constitute revising the statute, but we do not have the authority to do that." *Verska*, 151 Idaho at 895, 265 P.3d at 508. As we have explained, rewriting a statute is the province of the legislature: "The legislative power is vested in the senate and house of representatives, Idaho Const. art. III, § 1, not in this Court." *Id.*

As it pertains to the exception at issue here, the statute provides: "[t]o consider preliminary negotiations involving matters of trade or commerce in which the governing body *is in competition with* governing bodies in other states or nations[.]" I.C. § 74-206(1)(e) (emphasis added). Importantly, the use of the word "is" is not qualified with anything that would imply that merely a reasonable belief satisfies the express condition provided by the legislature. Further, the word "is" connotes a present state of being or, in the context of the provision, a present state of competition.[18] This plain reading is consistent with the express legislative mandate that this exception be construed narrowly. I.C. § 74-206(2). Thus, the plain and unambiguous conclusion is straightforward: this statute requires that a governing body actually be "in competition with" other governing bodies, not simply believe that they are or might be.

---

[18] In its briefing, counsel for the Board mocked the Attorney General's discussion on the importance of the word "is" in construing this statute by labeling it as "Clintonesque." However, as used by the legislature in section 74-206(1)(e), the word choice is critical because "is" is a "to be" verb expressed in the present tense. Had the legislature selected a similar verb, such as "was," "will be," or the verb phrase "may be," in place of "is," the phrase "*is* in competition with" would have an entirely different meaning. *See* I.C. § 74-206(1)(e) (emphasis added).

The Attorney General argues that the University of Arkansas had pulled out of the deal after its applicable governing body did not approve the sale at a public vote. Additionally, even if there were still an actual competition, the Attorney General argues that the structure of the University of Arkansas deal was such that it was not a "governing body" with whom the Board was in competition. The Board argues to the contrary, arguing that the Board was actually in competition with a governing body, even after the public vote of the governing body of the University of Arkansas. However, the reasonableness of the Board's belief is not a consideration based on the plain language of the statute. What matters here is the factual question of whether, at the applicable executive sessions, the Board was considering "matters of trade or commerce in which the governing body *is in competition with* governing bodies in other states or nations." I.C. § 74-206(1)(e) (emphasis added).

While the evidence in the record might support the district court's conclusion that the Board reasonably believed they were still in competition with another governing board, we hold that the plain language of Idaho Code section 74-206(1)(e) required a finding that the Board possessed evidence that it was still in competition with another governing body on the date of the meeting. Accordingly, we conclude that the district court erred by applying a reasonable belief standard to the evidence adduced at trial. Because the district court's error occurred at the summary judgment stage and influenced the parties' presentation of evidence at trial, we must vacate the district court's judgment. In fairness, both the Board and the Attorney General would likely have tried their cases differently had they been required to address the correct legal standard. Accordingly, the judgment of the district court entered after the bench trial is vacated.

### D. Attorney Fees

Following trial, the district court awarded the Board $233,362.87 in attorney fees pursuant to Idaho Code section 12-117(4) and $9,363.15 in costs after concluding that the Board was the "prevailing party." The district court alternatively awarded fees pursuant to Idaho Code section 67-1406(5).

Given our result and its implication on who may be the "prevailing party" following remand, we reverse the award of attorney fees and costs, and remand for the trial court to consider who the prevailing party is at the conclusion of the case. *Kelso v. Applington*, ___ Idaho ___, ___, 548 P.3d 363, 374 (2024); *Eagle Rock Timber, Inc. v. Teton County*, 172 Idaho 172, 187, 531 P.3d

34

488, 503 (2023). We express no opinion on the propriety of the amount awarded or the statutory authority upon which it was based.

## IV. CONCLUSION

For the reasons stated above, we conclude that this matter must be remanded because the district court erred in several ways. First, we reverse the district court's decision on the relation back of the new claim regarding the April 23, 2023, meeting, but affirm its decision to bar the amendment on the improper notice claim. Second, we conclude that the district court erred in its interpretation of the exception in Idaho Code section 74-206(1)(e) as it pertains to the meaning of (a) "preliminary negotiations" and (b) whether the Board possessed evidence that it was still "in competition with" another governing body on the date of each meeting at issue. In sum, we hold that the district court's interpretation effectively removed a word from one part of the Open Meeting Law ("preliminary"), while adding a phrase to another part of the law ("reasonably believed"). Principles of judicial restraint and statutory construction demand that we reject such an approach and interpret the statute as written by the legislature.

Therefore, because the legal standards applied by the district court erroneously shaped its rulings limiting the scope of discovery, granting partial summary judgment to the Board, and entering a judgment of dismissal following the subsequent bench trial, these rulings are vacated. Consequently, we also vacate the award of attorney fees and costs to the Board. This case is remanded for further proceedings consistent with the interpretation of Idaho Code section 74-206(1)(e) set forth in this opinion.

Chief Justice BEVAN and Justice MEYER and WILDMAN, Justice Pro Tem CONCUR

ZAHN, J. dissenting in part.

While I concur in much of the analysis contained in the majority's opinion, I dissent as to Part B, which holds that "preliminary negotiations," as used in Idaho Code section 74-206(1)(e), means "when the parties reach a precontractual understanding of the general terms from which the parties will continue to negotiate on the final details." The majority's interpretation fails to give effect to the legislative intent behind the "preliminary negotiations" language, which was to provide the State with a competitive advantage when it is in competition with other states or nations. Instead, the majority's interpretation rests on a fundamental misunderstanding that contract negotiations end when a contract is signed and also imports the concept of phased

negotiations, which finds no support in either the statutory language or the legislative history of the Open Meetings Law ("the Act"). Finally, the majority's interpretation effectively renders section 74-206(1)(e) unusable because it provides no clear guidance for when state agencies may utilize the preliminary negotiations exception. The absence of clear guidance concerning when the exception applies arguably renders the exception unconstitutionally vague. For all of these reasons, the majority's interpretation fails to give effect to the legislative intent underlying the statute.

In contrast, the district court's interpretation of the phrase as applying to "all negotiations preliminary to contracting" gives effect to the legislative intent behind the statute and provides state agencies with clear guidelines on when it applies. I would therefore affirm its grant of summary judgment on that issue.

"The interpretation of a statute is a question of law this Court reviews de novo." *Hess v. Hess*, No. 50719, 2024 WL 4587702, at *9 (Idaho Oct. 28, 2024) (quoting *Nelson v. Evans*, 166 Idaho 815, 820, 464 P.3d 301, 306 (2020)). "Statutory interpretation begins with the literal language of the statute. If the statutory language is unambiguous, we need not engage in statutory construction and are free to apply the statute's plain meaning." *Hill v. Blaine County*, ___ Idaho ___, ___, 550 P.3d 264, 274 (2024) (quoting *Nordgaarden v. Kiebert*, 171 Idaho 883, 890, 527 P.3d 486, 493 (2023)). "However, if the statutory language is ambiguous, this Court must 'look to rules of construction for guidance and consider the reasonableness of proposed interpretations.' " *Nordgaarden*, 171 Idaho at 890, 527 P.3d at 493 (quoting *City of Idaho Falls v. H-K Contractors, Inc.*, 163 Idaho 579, 582, 416 P.3d 951, 954 (2018)). "Statutory language is ambiguous where reasonable minds might differ or be uncertain as to its meaning." *Hill*, ___ Idaho at ___, 550 P.3d at 274 (quoting *Nordgaarden*, 171 Idaho at 890, 527 P.3d at 493).

The phrase "preliminary negotiations" in Idaho Code section 74-206(1)(e) is ambiguous because there are two reasonable interpretations of the phrase. On one hand, the Idaho State Board of Education argues that the phrase encompasses all negotiations preliminary to contracting. On the other hand, the Attorney General argues the term means a stage of negotiations that are preliminary to the final negotiations that precede contracting. Both interpretations are reasonable.

"[I]f the statute is ambiguous, this Court must engage in statutory construction to ascertain legislative intent and give effect to that intent." *Saint Alphonsus Reg'l Med. Ctr. v. Gooding County*, 159 Idaho 84, 87, 356 P.3d 377, 380 (2015). "To ascertain the legislature's intent, this Court examines the literal words of the statute, the context of those words, the public policy behind

36

the statute, and the statute's legislative history." *Id.* The majority's interpretation of "preliminary negotiations" fails to properly analyze each of these factors and therefore fails to give effect to the legislative intent behind the preliminary negotiations exception.

**A. The majority's interpretation fails to properly examine the literal words of the statute and their context because it is based on the faulty premise that all negotiations occur prior to contracting.**

From the outset, the majority's conclusion is built on a faulty premise: that all contract negotiations occur prior to contracting. Majority Op., *supra*, at 25 ("Taken together, the common understanding of 'preliminary negotiations' in a commercial transaction, as contemplated by the statute, suggests that Idaho Code section 74-206(1)(e) only applies to a phase of negotiations preliminary to the final negotiations, *and not all negotiations*." (emphasis added)); *id.* at 29 ("For all these reasons, we conclude that the district court erred in its conclusion that the phrase 'preliminary negotiations' *encompasses all negotiations*." (emphasis added)). The faulty assumption that negotiations definitively end at the time the contract is signed infects the rest of the majority's analysis, leading it to conclude that because all negotiations occur prior to contracting, the word "preliminary" must mean a subset of negotiations that occur prior to contracting. In reality, however, the law recognizes that negotiations can continue after contract formation. *See* 17 C.J.S. *Contracts* § 110 ("[P]arties may agree on some terms sufficient to create a contract, leaving other provisions for later negotiations.");77A C.J.S. *Sales* § 114 (explaining that, under the Uniform Commercial Code, a contract can include indefinite terms that can be negotiated later (citing various cases including *D. R. Curtis Co. v. Mason*, 103 Idaho 476, 478, 649 P.2d 1232, 1234 (Ct. App. 1982)); 2 Howard O. Hunter, Modern Law of Contracts § 24:3 (Mar. 2024 update) (describing modern contracting as an ongoing process that may leave terms open for subsequent negotiation after the formation of an initial contract).

Once this faulty assumption is eliminated from the analysis, the literal words of the statute and their context support the district court's interpretation that "preliminary negotiations" are those negotiations preliminary to contracting.

Contrary to the majority's assumption, contract negotiations can and do occur following the execution of a legally binding agreement. At the time of contracting, parties can, and often do, leave certain terms for further negotiations. They can amend the contract to encompass additional work or limit the scope of work. They can negotiate unanticipated conditions that arise after contracting. The law recognizes a variety of instruments to memorialize these post-contracting

37

negotiations, such as addendums, amendments, and change orders. One need only review this Court's caselaw to find multiple instances of parties engaging in post-contract negotiations. *See, e.g.*, *Phillips v. Gomez*, 162 Idaho 803, 805, 405 P.3d 588, 590 (2017) (describing addendums and amendments to a real estate contract); *City of Meridian v. Petra Inc.*, 154 Idaho 425, 438–39, 299 P.3d 232, 245–46 (2013) (describing a change order for the costs of a construction project between a contractor and a city); *Caldwell Land & Cattle, LLC v. Johnson Thermal Sys., Inc.*, 165 Idaho 787, 797, 452 P.3d 809, 819 (2019) (describing amendments to a real estate lease).

When this faulty assumption is removed from the analysis, the primary justification for the majority's interpretation falls apart. In the real-world, contract negotiations occur both before and after the execution of a binding agreement. As a result, there is no basis to conclude that "preliminary negotiations" must mean a subset of the negotiations that occur prior to contracting. The majority's importing of "phased contracting" principles from treatises, law reviews, and out-of-state caselaw finds no support in the Act. Rather, in different sections, the Act refers to "preliminary negotiations" and "all negotiations." Because it is not unusual for contract negotiations to continue after contracting, the use of "all negotiations" in Idaho Code section 74-206A(1) supports the district court's interpretation that the phrase "preliminary negotiations" refers to something different—those negotiations occurring prior to contracting.

**B. The majority's interpretation fails to give effect to the public policy underlying the statute by interpreting the exception in a manner that renders it unusable.**

The majority argues that its interpretation of the statutory language is consistent with the Act's statement that "the formation of public policy is public business and shall not be conducted in secret." I.C. § 74-201. However, its interpretation is an incomplete application of public policy because it fails to implement the public policy embodied in the preliminary negotiations exception.

The legislature created exceptions to the general requirement of open meetings, including the preliminary negotiations exception. *See* I.C. § 74-206(1)(e). The legislature's enactment of exceptions constitutes a recognition that, while public meetings should be generally open to the public, there are instances when public policy dictates that a matter can be discussed in private. This recognition is found in the opening sentence of Idaho Code section 74-203: "*Except as provided below*, all meetings of a governing body of a public agency shall be open to the public and all persons shall be permitted to attend any meeting *except as otherwise provided by this act*." I.C. § 74-203(1) (emphasis added).

The majority's interpretation advances one of the public policies embodied in the Act (a preference for open meetings) at the expense of the other (that there are instances when matters can be discussed in private). Nothing in the Act suggests that the former controls over the latter. To ascertain the legislative intent of the exception, we must consider the entirety of the public policy, including the policy embodied in the exception. As discussed below, the intent behind this exception is to allow a state agency to maintain its competitive advantage when it is competing with the governing body of another state or nation in matters of trade or commerce. While the legislature has directed that those exceptions should be narrowly construed, the majority's interpretation essentially renders the exception a nullity. The majority concedes that the determination of whether a state agency was in preliminary negotiations requires "a case-by-case examination of the facts." The lack of any clear guidelines concerning when negotiations move from a preliminary stage to a final stage leaves state agencies to guess whether they may lawfully enter into executive session. State agencies are unlikely to use the exception so they avoid the risk that their contracts are later declared invalid. Forcing agencies to guess about the applicability of the exception fails to give effect to the public policy underlying the exception.

The majority argues that its interpretation of "preliminary negotiations" is consistent with the legislature's directive that "[t]he exceptions to the general policy in favor of open meetings stated in this section shall be narrowly construed." Majority Op. at 25–26 (quoting I.C. § 74-206(2)). In actuality, its interpretation goes far beyond a narrow construction and effectively nullifies it. The majority's case-by-case, post-hoc approach to determining whether an agency was engaged in preliminary negotiations leaves agencies with a Hobson's choice. They can never be certain whether they are still in "preliminary negotiations" or have advanced to "final negotiations" that precede contracting. Whether to invoke the preliminary negotiations exception to adjourn into executive session will necessarily involve a guessing game. If they are wrong, any contract resulting from the preliminary negotiations considered in executive session will be declared void. Under these circumstances, considering all contract negotiations in open meetings is the only viable option assuring that subsequent contracts are legal. An interpretation that effectively nullifies the exception goes far beyond a narrow construction.

In contrast, the district court's interpretation implements the public policy behind the exception and the legislature's directive that exceptions are to be narrowly construed. An agency cannot enter into an executive session under the preliminary negotiations exception unless they

39

possess evidence that they are in competition with the governing body of another state or nation. If they do not possess that evidence, then the consideration of all negotiations must occur in open meetings. If, however, they have that evidence, then they may meet in executive session to consider negotiations preliminary to contracting. Once the contracting is completed, any further negotiations concerning the contract must occur in an open meeting. Under these criteria, the district court's interpretation advances the public policy of providing a narrow exception that permits a state agency to maintain its competitive advantage during preliminary contract negotiations.

## C. The majority's interpretation fails to give effect to the legislative intent behind the exception: to maintain the competitive advantage of state agencies in specific situations.

The legislature first passed the Act in 1974. Act of Apr. 2, 1974, ch. 187, 1974 Idaho Sess. Laws 1492–95. The act originally included a broadly worded exception that allowed for an executive session to be held "to consider matters of trade or commerce." I.C. § 67-2345(1)(e) (Supp. 1974). In 1977, the legislature amended the trade or commerce exception. *See* Act of Mar. 29, 1977, ch. 173, 1977 Idaho Sess. Laws 445–47. The minutes of a House State Affairs Committee meeting on the proposed legislation suggest that the amendments were intended to remedy abuse of the exception, as "matters of trade or commerce" could encapsulate a very broad swathe of matters. *Hearing on RS 1681C2 (HB 257) Before the H. State Affairs Comm.*, at 1–2, 44th Leg., 1st. Reg. Sess. (Idaho Feb. 10, 1977) (statement of Rep. Ingram). Multiple committee hearings were held on the proposed legislation. A review of meeting minutes suggest that the first draft of the bill entirely eliminated the trade and commerce exception. *See id.* at 1. However, later minutes indicate that the bill's language was subsequently amended to maintain the exception but significantly narrow its application. *See Hearing on RS 1681C2 (HB 257) Before the H. State Affairs Comm.*, at 1, 44th Leg., 1st. Reg. Sess. (Idaho Feb. 14, 1977). The minutes further suggest that the changes were made in response to concerns voiced by the Port of Lewiston that deleting the exception could disadvantage state entities during contract negotiations:

> Rep. Hosack told the Committee that Carl Moore of *the Port of Lewiston wishes to speak to this bill*. He is *concerned with our striking "to consider matters of trade or commerce"* on Line 14, Page 3.
>
> Rep. Ingram said *abuse of the executive session has been so common that it has to come out* and *he thinks the Port of Lewiston can work around it*.
>
> Rep. McDermott is *concerned that we are going to change a law that will cause a valuable part of our economy a problem. . . .*

40

. . . .

> Rep. Ingram said that if Mr. Moore were here, he would say *they needed to go behind closed doors to negotiate contracts*, but this trade and commerce exemption has been abused too often.

> Rep. Hosack explained that Mr. Moore called him for information and would like *to have the opportunity to indicate to the Committee why it is essential to leave "trade and commerce" in the Bill*. He will be in Boise tomorrow.

*Hearing on RS 1681C2 (HB 257)*, at 1–2 (Feb. 10, 1977) (emphasis added) (statements of Rep. Hosack, Rep. Ingram, and Rep. McDermott).

Ultimately, the bill's sponsor proposed statutory language to narrow the exception so that the exception only applied to "preliminary negotiations involving matters of trade or commerce in which the governing body is in competition with other governing bodies and other states":

> Rep. Ingram remarked that he thought the press had been unfair in its criticism of the Committee in holding this RS. It was not that the Committee was unfriendly to Open Meetings; it was agreed that some changes needed to be made before action. *He went on to explain that the language he now wishes to insert in the RS was originally given to him by the Lewiston Port authorities*, as follows: " . . . to consider preliminary negotiations involving matters of trade or commerce in which the governing body is in competition with other governing bodies and other states." This would be pretty exclusive for the Port of Lewiston and should solve our problem.

> *Rep. Hosack said he believed this language would satisfy Mr. Moore.*

> . . . .

> After some discussion Rep. Ingram said if the new language meets with approval *he will bring a clean RS to the Committee.*

*Hearing on RS 1681C2 (HB 257)* (Feb. 14, 1977) (emphasis added) (statements of Rep. Ingram and Rep. Hosack). The amended version of the bill passed by the legislature utilized the language proposed by Lewiston Port authorities. *See* H.B. 257, 44th Leg., 1st Reg. Sess., 1977 Idaho Sess. Laws 445, 446.

The legislative history underlying the preliminary negotiations exception establishes two purposes: (1) to limit application of the trade or commerce exception; and (2) to protect a state agency's competitive advantage when it is in competition with other states or nations concerning matters of trade or commerce. The majority's interpretation gives effect to the first, but not the second. Its interpretation strips state agencies of their competitive advantage at the most sensitive stage of contract negotiations: negotiating the final terms and conditions of the contract. It is unclear how allowing a state agency to "reach a precontractual understanding of the general terms"

in private provides it with a competitive advantage when it then has to negotiate the final contract terms in public. The majority's interpretation fails to give effect to both purposes underlying the exception. It renders the exception unusable and deprives state agencies of their competitive advantage when they need it the most.

Nothing in the legislative history indicates that the legislature contemplated a "phased approach" to business negotiations when it used the phrase "preliminary negotiations." Instead, the "phased approach" to negotiations has been imported by the majority from treatises, law review articles, and caselaw from two other jurisdictions. Nothing in the legislative history of the statute suggests that the legislature believed that "all negotiations" occur prior to contracting. Instead, the legislative history suggests that the legislature was concerned with ensuring the exception was not abused while protecting a state agency's competitive advantage during contract negotiations.

Interpreting the statutory exception to only allow executive sessions "up to the point when the parties reach a precontractual understanding of the general terms—such as the scope of the purchase and the purchase price—from which the parties will continue to negotiate, incur costs for due diligence, and work out the final details" fails to give effect to the legislative intent behind the statute. Under the majority's interpretation, a competitor could attend or stream a public meeting to learn the "scope of the purchase and the purchase price" and other definite terms and then use that information to outbid and undercut a state agency's negotiating position.

In contrast, the district court's interpretation gives effect to both purposes underlying the language. As discussed previously, a state agency may only adjourn to executive session to consider preliminary negotiations concerning matters of trade or commerce when it is in competition with the governing body of another state or nation. Further, it may only meet in executive session to consider those negotiations preliminary to contracting; any negotiations that occur after contracting must be discussed in an open meeting. These restrictions significantly narrow the applicability of the exception. The district court's interpretation limits the applicability of the exception while providing a state agency with a competitive advantage until it executes a legally enforceable contract.

**D.  The majority's interpretation arguably fails to uphold the constitutionality of the statute.**

Finally, the majority's interpretation of "preliminary negotiations" likely fails to abide by the maxim that, when possible, the Court "is obligated to seek an interpretation of a statute that upholds it[s] constitutionality." *Am. Falls Reservoir Dist. No. 2 v. Idaho Dep't of Water Res.*, 143

42

Idaho 862, 869, 154 P.3d 433, 440 (2007) (first quoting *E. Idaho Reg'l Med. Ctr. v. Minidoka Cnty. Bd. of Cnty. Comm'rs* (*In re Bermudes*), 141 Idaho 157, 159, 106 P.3d 1123, 1125 (2005); and then quoting *Moon v. N. Idaho Farmers Ass'n*, 140 Idaho 536, 540, 96 P.3d 637, 641 (2004)). "The void-for-vagueness doctrine results in the invalidation of statutes that are so vague as to invite incongruous results because it would leave the 'public uncertain as to the conduct it prohibits' and 'judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.'" *Walsh v. Swapp L., PLLC*, 166 Idaho 629, 641, 462 P.3d 607, 619 (2020) (quoting *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 715, 791 P.2d 1285, 1294 (1990)).

The majority's interpretation provides no guidance concerning when the "preliminary" phase of a negotiation ends, and the parties shift to the later stages that must be held in public. It acknowledges that determining whether "preliminary negotiations" have concluded is "highly fact sensitive, may vary in different cases based on the course of the dealings, and typically requires discovery before the trier of fact can make a reasoned finding." As the district court correctly noted, this standard is "uncertain[]" and "unworkable." Under the majority's interpretation, a private party whose contract with the State is voided due to a violation of section 67-2345(1)(e) may have a viable legal argument that the law is so vague it is unconstitutional.

The purpose of the Act is to give state agencies clear guidelines on when their meeting must be open to the public. The majority's decision provides absolutely no guidance to state agencies in this regard. The majority's interpretation leaves an agency to guess whether its negotiations are still preliminary, or whether they have developed to the point that they are "final." The majority concedes that its interpretation provides no bright line rules and can only be assessed on a case-by-case basis, after engaging in discovery. Majority Op., at 25.

In practice, government agencies will be forced to conduct all their negotiations in public, for fear that their inability to discern when their negotiations morph from "preliminary negotiations" to "final negotiations" will result in their business deal being declared null and void for an unknowing Open Meetings Law violation. The majority does not just move the goalposts, it warns state agencies that there are goalposts but refuses to tell them where they are located.

Whether section 74-206(1)(e) is declared unconstitutionally vague, or agencies simply stop using the exception to enter an executive session for fear of an Open Meetings Law violation that would void their contract, the majority's opinion eviscerates the exemption contemplated by the legislature in passing section 74-206(1)(e). Thus, it is the majority, not the district court, that fails

43

to give effect to all words of a statute and ignores the legislature's intent. "It is incumbent upon this Court to interpret a statute in a manner that will not nullify it, and it is not to be presumed that the legislature performed an idle act of enacting a superfluous statute." *Darrow v. White*, 172 Idaho 272, 280, 531 P.3d 1169, 1177 (2023) (quoting *Sweitzer v. Dean*, 118 Idaho 568, 572, 798 P.2d 27, 31 (1990)).

In summary, the majority's interpretation of "preliminary negotiations" is based on fundamental misunderstanding of contracting and therefore fails to properly consider the literal language of the exception and its statutory context. It fails to give effect to the public policy underlying the statute because it renders the exception unusable. It does not advance the legislative intent underlying the statutory language but instead imports its own "phased approach" to contract negotiations, which finds no support in the legislative history. Finally, the majority's interpretation is so entirely lacking in guidelines or parameters that it leaves a state agency to guess whether it may properly adjourn to executive session. This uncertainty may well be an unconstitutionally vague interpretation that would not withstand constitutional scrutiny and renders the statute unworkable.

On the other hand, the district court's interpretation of "preliminary negotiations" is based on the realities of contracting. Contract negotiations often occur both before and after the execution of an enforceable agreement. It gives effect to the twin purposes underlying the preliminary negotiations exception: to limit application of the exception to specific circumstances and to maintain the State's competitive advantage when it possesses evidence that it is in competition with governing bodies of other states or nations on matters of trade or commerce. Because the district court's interpretation is the one that advances the legislative intent underlying the exception, I would affirm its partial grant of summary judgment on this point.

To be clear, if this is not how the legislature intended the statute to operate, it can amend or repeal the exception contained in section 74-206(1)(3). That is exactly what the legislature did in 2015 when it created section 74-206A and required that all labor negotiations, with certain limited exceptions, be conducted in open session. Act of Apr. 6, 2015, at § 2, 63d Leg., 1st Reg. Sess., 2015 Idaho Sess. Laws 1125, 1126. I would also note that, while I dissent from the majority's interpretation of "preliminary negotiations," I fully concur in its interpretation of the other requirement for entering into executive session to consider preliminary negotiations: that the state agency be in possession of evidence indicating that it is in competition with the governing bodies

44

of another state or nation. As a result, this case will go back to the district court for further proceedings. Interpreting "preliminary negotiations" to mean those negotiations preceding contracting does not, standing alone, establish that the State Board of Education properly adjourned to executive session on April 25, 2023, and May 15, 2023.

For the foregoing reasons, I respectfully dissent in part from the majority opinion.